0503-CJ-RBI and C.J. W. W. Company, plaintiff's attorneys, and Rachel L. Stewart, formerly known as Rachel O'Connor, defendant's attorneys. Mr. Vine, you may proceed. Thank you, Your Honor. May it please the Court, my name is Ted Vine, Jr., and I'm here today on behalf of the defendant and appellant, Rachel Stewart. We have today in front of the Court a case where the lower trial court has granted an adverse possession claim against a piece of real property which has been titled in my claim's name dating all the way back to 1963. We are here today on appeal essentially arguing that the vast majority of the elements of an adverse possession claim have not been shown and that summary judgment should not have been granted by the trial court. The courts in Illinois have been pretty clear that adverse possession is an extraordinary remedy. The presumptions are to all come down in favor of the true owner of the property, that being my client, and that all of the elements of an adverse possession claim must be proven by strict, clear, and unequivocal evidence. Mr. Vine, one of the problems, at least as represented in the briefs, is notice to your client. Correct. Well, as I recall the record, and I don't want to talk about their divorce, that they had to get divorced. Sure. The divorce came from probably the state of Connecticut where she went first? I believe the divorce occurred here in Illinois because there were residents in Illinois at the time. But it was a default, wasn't it? He did not participate? That I don't think was completely clear. Okay. Being so old, there was no paperwork available. But how was anybody supposed to know where she was, I guess, is the issue in order to give her notice. Well, I guess the answer to that question is in 2017 when the plaintiffs decided they wanted to sell the property, they had no trouble finding her and contacting her and saying they wanted to sell the property. Well, assuming they went to the title company to try to clear things or see what was going on, why would they do that? Why would either O'Connor do that or Gloria or our third party here, why would they do that prior to any problem with the house? Well, I would posit that they should have done it much sooner than they actually did. In 2003, her ex-husband, John O'Connor, passed away. And normally when somebody passes away, the family does some investigation into the estate to find out who owns what and who is entitled to inherit anything as an heir or a legatee or, in this case, as a joint tenant. My client's ownership of this property has been off record since 1963, even if these plaintiffs could argue that they didn't have actual notice of her ownership claim. They certainly had constructive notice of it because once a document is reported, the world has constructive notice of that ownership claim. So all the way back to 2003, I would posit that these plaintiffs had an obligation to at least look into the title of the property and to find out whether it in fact belonged to the ex-husband's new wife or to the daughter. But they didn't do it at that time. In 2010, just prior to her death, Gloria O'Connor, the second wife, signed a quitclaim deed relinquishing the property to her daughter, Ms. Valenciano. Why did they not in 2010 research at that point who owned the title to this property, especially in light of the fact that they were going to go to the reporter's office and report a deed to the property? And then again in 2017, the property was deeded from Ms. Valenciano to their development company. Again, why didn't they check the title at that point? But they decided at that point, after this fire had occurred, after the house had been reconstructed and they were going to sell it, they decided only in 2017, let's do a title search, and they had no trouble finding my client at that point. So I would argue here that the concealment of John O'Connor's death for all of those years worked to their benefit and certainly to my client's detriment. And had she been notified much sooner of what had occurred, she would have taken action to claim her interest in the property. She could only take action here because she was sued very shortly after she was contacted and refused to sign a deed relinquishing her ownership of the property. So a material element of an adverse possession claim by definition is adversity. Was the possession of the property adverse and hostile to my client's interest? For all she knew from 1968 all the way up until 2017, admittedly a long period of time, for all she knew her husband was still alive and was still living in the property because nobody had ever contacted her to do anything with the property. Well she had left with children, they have a couple of children and apparently she left and he didn't know where they were, so why would Gloria, and I hate to use first names but we have too many people with the same last names, why would Gloria think to even think about her since she was gone and he didn't have his children? Well Gloria certainly knew that she didn't own the house. She was not part of the purchase when it was originally bought. Well did she know that George wasn't the, or John wasn't just the owner? Well she would have known she didn't participate in the purchase, she wasn't on the purchase money mortgage when it was acquired, and again as a matter of constructive notice all she had to do was go to the reporter of deeds office and look up the title to the property to find out who was on the last deed dating back to 1963. That's a matter of public record, even if she could have claimed at the time I didn't have actual knowledge of ownership, she could have done a minimum amount of research to find out, but the law says once the document has been recorded the entire world has constructive notice of its existence. So the concealment of the ownership is a material issue in this case. You know I cited throughout our brief the Nora case which is a 2017 decision out of the first district, and in that case we had a mother and a daughter work together because of a divorce situation, sounds somewhat similar here, but the daughter wanted to buy this piece of property. She was concerned that her husband or her ex-husband was going to make some kind of claim to it, so she worked out this plan with her mother for the daughter to pay all of the expenses associated with the property, but for the mother to be the record title holder. So they bought the property, title went to the mother, the mortgage was in the mother's name, the mother never took occupancy or possession of the property and never paid a nickel towards its ownership. The daughter paid absolutely everything. The mother then passes away, and along comes another daughter who makes a claim through the probate court saying this is one of mom's assets, not my sister's, therefore I'm entitled to half of the value of the property, and the court agreed with the daughter. They agreed with the other daughter, even though the mother had not contributed a nickel towards this property. So similar to this case where I admitted to my claim for close to 50 years, didn't pay the property taxes, didn't pay the maintenance, didn't pay the insurance, didn't pay any of those things of those nature, in the Norick case the use of the property was considered entirely permissive. It was not adverse, it was not hostile. So here we have a case where my client allowed her ex-husband to continue staying in the property and until 2017 had no idea that he passed away and had no idea that he was no longer in possession. So in my belief, the adverse and hostility element of an adverse possession claim, which is the first element that has to be proved, has not been proved yet. The trial court should not have granted some judgment. The second, or two of the other elements, rather, of an adverse possession claim are actual possession and continuous possession for 20 years. 20 years is an important factor here as well. So John O'Connor passes away in 2003. I'm sorry, 1993. I misspoke. He passed away in 1993. And 17 years later, in 2010, Gloria O'Connor passes away. So for those 17 years, Gloria O'Connor has actual and continuous possession. The problem that we have here in trying to get to that 20-year mark is that from 2010 all the way up until the present, no one has been in true possession of the property. It's been essentially a vacant parcel with the exception of a year or two where the plaintiff's son was a tenant in the property. And we cited in our briefs the Eli v. Brown case. It's admittedly an older case. I think it's 1899. But it was an Illinois Supreme Court decision. And it said when determining an adverse possession claim and whether possession was both continuous and actual, the possession has to be actual. It cannot be constructive possession. So meaning in this case from 2010 all the way up until the present, at most this plaintiff does not have actual possession. She has not lived in the property since 1991. At most all she had was constructive possession. Constructive possession cannot be used in ascertaining whether the 20-year mark had been hit. So that's a significant issue in this case as well is whether we've gotten to that 20-year mark. And I would argue to this Court they're at least three years short. Had Gloria O'Connor lived three more years and come in in 2013 and said I've been there for 20 years, she maybe would have met that element. But that's not what occurred here. This property has been essentially unoccupied by anybody since 2010 other than, again, the son of the plaintiff. They don't have the 20 years that they can tack together. What do you believe was the rationale the Court used that you believe to be error? I believe the error, well, I think the primary error was that the possession was not permissive. The trial court essentially found that the possession was adverse and hospitable. The trial court also found in its decision that after Gloria O'Connor passed away that these plaintiffs were entitled to tack on their constructive possession to the 17 years of actual possession that had occurred from 1993 through 2010. So I think those two elements that are severely missing in this case. A final element of an adverse possession claim is that there has to be some kind of claim of ownership, some kind of color of title. Well, there really isn't any here. What's happened is, as I've mentioned previously, it's been a matter of public record since 1963 that my client was a record title owner of this piece of property. In 2010, Gloria O'Connor, with no ownership interest in the property whatsoever, signs a quick claim deed over to her daughter. Now, even if we were, Gloria O'Connor were to assert an adverse possession claim prior to her passing, she didn't have the 20 years at that point. She had only been in exclusive possession of the property for 17 years. So when she signed that deed, she did not have color of title. Again, had she survived another 13 years and remained, I'm sorry, 3 years and remained in possession of that property the additional 3 years, at that point she could have claimed that that deed gave her a color of title because she had an adverse possession claim. She never got there on her own. And the tacking here just doesn't work because you can't tack a constructive possession claim onto an actual possession claim. Did your client at any time have any obligation to check on that property or see what the status of the property was? I don't know that the law creates any kind of obligation. And I kind of go back to the Kenora case on this thing. There's really nothing out there that says that you can be divested of title in a piece of real estate just because you ignored it, just because you didn't pay the taxes, the maintenance, the insurance, the utilities, you didn't go check the property. There's nothing that says you can be divested of title for those things. There is a separate statute where you can lose title for nonpayment of taxes for 7 years, but the trial court correctly found here that these plaintiffs were unable to establish that they had done that for those 7 years. Well, that's as a matter of law. Are there any equitable provisions that could be called upon to say that your client needed to do something to secure her interest in the property? Not to my knowledge. I haven't seen a single case that has said that she's got some kind of obligation to check on the property, maintain it, do anything with the property whatsoever because, again, I think the reason that doesn't exist is that adverse possession is such an extraordinary remedy. The unique element of this particular case is that we have a plaintiff who doesn't own any of the surrounding property. They're looking to take away the entire parcel. Virtually every adverse possession case that I've ever reviewed involves a neighboring property owner essentially expanding their footprint, saying I need to take away this piece of property for a roadway or I put my fence over here and I took some of your land away. But they're somehow looking to expand their footprint. Where this case is unique is I haven't seen a single Illinois case where a neighboring property owner, a non-neighboring property owner, took away an entire parcel on an adverse possession. It's never happened before. So to answer Your Honor's question, I think the reason there may be no equitable discussion about what her obligations were is because it's never happened before. Actually, I think there was. It's an older case where either a road district or a railroad took away property on that issue. But that wouldn't be relevant. It wouldn't be relevant here. But normally if you're an adjoining property owner, you're kind of keeping an eye on what's going on next door. So in terms of an obligation of maintenance or seeing whether the taxes are being paid, that would exist with a neighboring property owner. But that's not what's happening here. They're taking away the entire footprint. So what the trial court has done here I think is unprecedented in Illinois law. I don't think it's ever happened before that the survivors of a deceased joint tenant took away an entire parcel of land when they did not own a neighboring parcel. So because this is so unprecedented, because I think they've missed material elements of an adverse possession claim, including the hostile and adverse element, the actual and continuous possession element, and the claim of ownership or color of title element. But all of those elements are missing here. The trial court should not have granted summary judgment. We're asking that this court reverse the trial court and send it back for further proceedings. Did the timer go off? I didn't think so. No.  You'll have an opportunity to make the votes. Thank you. Mr. Venturi, you may proceed. May it please the Court. Excuse me. Dan Venturi on behalf of the appellee. Chris Valenciano and her husband Mike Valenciano are in the audience today. This is a claim for adverse possession. The plaintiff in the appellee here is the daughter of the former spouse of the defendant. John O'Connor is Christine Valenciano's father and was the first husband. And Rachel Stewart was John O'Connor's first wife. Rachel Stewart abandoned the property in 1968. This was their personal residence and never returned or communicated about the property for almost 50 years. When you say abandoned, what do you mean? She picked up her stuff, left the state of Illinois, and never returned to Illinois, never had any communication regarding the property, never had any inquiries regarding the property, never visited the property again in 50 years. Well, how do you know she didn't talk to her ex-husband before he died? In her deposition, which we went to Florida for her deposition so she hadn't been back to Illinois. She said she had never talked to John O'Connor after the divorce. Does that constitute an abandonment of the property? That, coupled with no inquiries regarding the property, never visiting or observing the property, never having any discussions regarding the property. In her deposition, she was asked, have you ever discussed your property interests with your children? So if something happened to you, they would be able to know about this. And her answer was no, I've never talked to them about it. So there was never any discussion regarding it. So how does abandonment fit into adverse possession? Well, basically you're allowing somebody else to take control of the property, which is exactly what happened here in 1968 when she left there after John O'Connor exclusively possessed the property, controlled the property, insured the property. When you say exclusively possessed, what do you mean? He lived there. It was his personal residence. Well, I think exclusive for purposes of adverse possession relates to whether or not he claimed the right over everyone on earth, which meant that he claimed the right to possession in spite of his ex-spouse's joint tenancy. And I believe that's the case, and I think the facts are clear, and it's consistent with the law in Illinois, that I think his possession of the property actually constituted what is known as an ouster. When you have a co-tenant, as the Court, I'm sure, is aware, that the general rule is that you're acting on behalf of your co-tenant. Normally somebody who's ousted doesn't abandon the property. So which is it? She either left it voluntarily and abandoned it, or as you just said, he kicked her out. Well, she actually voluntarily left. From her deposition, she didn't tell him she was leaving. She just packed up her children, which were not his children, they were children from a prior marriage, packed up her three children and left and never returned. Subsequently, there was a divorce, although she wasn't clear of the details of how or where that actually occurred. So she had left the property. And I think the law is clear that if somebody actually is a co-tenant but actually is exclusively controlling the property, that that will constitute an ouster. I'll use the language in the Neckman's case, which says, to create an ouster there must be an actual and exclusive possession of the whole premises claiming the whole. In this case, he locked the doors, he controlled who came on the property, he paid the taxes, he did not account in any way, shape, or form to Stewart for her interest in the property. And that possession occurred from 1968, when she left, until 1993 and his death, which was 25 years. Thereafter, after his death, from the title perspective, Rachel Stewart became the sole property owner, however, again, had no involvement with the property, had never talked to, in her deposition, she concedes that she never had any conversations whatsoever with either Gloria O'Connor, Christine's mother, or Christine, other than the day of the deposition. She had never had a single discussion or communication with her. So she's never made any attempt to interfere with or were the people in possession of the property receptive to her interfering with their control of possession of the property. I don't know how you can be... Well, would that be considered hostile? Her failure to do these things, as you just described? Rachel Stewart's actions? I don't think her actions were hostile at all. I think they were just, she just allowed it to happen. And the case law says if you allow somebody to take control of your property for 20 years, you lose it. I think that's what... But do you lose it to adverse possession or some other... Yes, and I think that's what the Supreme Court is very clear that when you allow somebody else to take full control of your property for an extended period of time, and the law says 20 years, we really have over 50 years at this point of that occurring. While Mr. O'Connor was still alive, how would we count that period of time? It's a great question. There's actually three periods of time. There's the period while he was alive from 1968 until 1993. At that time, he was a co-tenant. And in order to establish adverse possession as a co-tenant, the standard's higher. You can have adverse possession in cases where you've mowed the lawn for 20 years and planted trees, but in order to have an ouster and to have the significance that you need for a co-tenant, you have to control the property, pay the taxes, and in all ways treat the property as your own. And the cases say that the treating of the property as your own is how the neighbors would perceive who owns the property. And that's what the case law says. And we clearly have that for the 25 years from 1968 to 1993. Then in 1993, we have a significant change. We have Gloria O'Connor becomes the possessor of the property, still living in the property as her principal residence where she lived until the day she died. She lived there. She still controlled the property exclusively, controlled who came there, paid the taxes, paid the insurance, and did all of those things. Shortly before her death in 2010, almost 30 days before she died, she deeded the property to her daughter. She didn't do a title search. Obviously, she was pretty much on her deathbed. She was dying. And she was just trying to get things in order, prepared a quick claim deed to her daughter to convey any interest she has in that property. I honestly believe, and obviously I don't have depositions, I believe she believed she owned the property. Her husband owned it and then she owned it. But there were ways she could have found out that she actually owned the property. You're absolutely right. She didn't do that. So what obligation as a matter of law does she have to do that? Under adverse possession, she has no obligation because by law, under adverse possession, you're taking it contrary to anybody who may own it by legal title. So that's the law of adverse possession. You don't have an obligation. You actually are saying I'm possessing this property as if I own it, even if I don't. That's what adverse possession is. And that's so she doesn't have any obligation. In hindsight, yes, that would have been the thing to do. Well, in fact, if you are claiming adverse possession, you are sort of tacitly agreeing that somebody else owns that property, correct? When you're filing that claim, it doesn't mean when you started possession you believe that. But when you're filing your claim, you're saying I own it because I've possessed it for 20 years. If I've possessed it for 19 years, I don't own it. But after 20 years of you possessing it, you do. She had no interest in the title while Mr. O'Connor was alive, did she? She wouldn't have any interest in legal title. But as a matter of legal titles, they didn't do any transferring or work with the property then? They did not. I mean, you've got to remember, if you go back to 1968, they bought the house in 1968. Real estate was the interest rates were going up. People weren't buying houses. I mean, it was really you had your mortgage and you stuck with your interest rate because if you went to refinance, you were going to be paying a much higher interest rate. The interest rates, if you remember, in the 70s were 12%, 14%. So people, if you had a 5% or 6% mortgage, you weren't trying to refinance. So you weren't checking your title. You said something about legal title. If the word legal is not surplusage, what is the alternative form of title? An equitable title? Or if you establish title by adverse possession, then you do become the legal title holder at that point, and that's what we're looking to do is become. You were talking about the relationship between the husband and the wife, and if he was the sole owner and he allowed her to live in the house with him, how does she acquire legal title that way? In Illinois, real estate title passes to your heirships automatically by law. So if you own real estate and you die, it automatically goes to your heirs, subject to your executor's ability to take that real estate if they needed to pay the creditors. So it automatically transfers by heirship. So you are aware that there's a difference between joint tenancy and tenancy in common, are you not? I am, absolutely. And upon the death of a joint tenant, the title passes to the other joint tenant or tenants? Correct. So why are you saying that when he dies and his ex-wife is the sole other joint tenant, this supposedly went to a second wife? No. If he owns the property, the legal title will go to the surviving joint tenant. But if he still had interest after his death, it would go to his heirs. So if he owned it as tenants in common, his in common interest would go to his heirs. If he owns it as joint tenants, it goes to the surviving joint tenant. Nobody's disputing that. So then how is it that his second wife has any legal or equitable title? I don't understand how she can claim ownership, legal, equitable, or otherwise, unless she has some idea, some relative certitude, that he owned the property as a tenant in common or as a sole owner. I think in her mind, she believed that he owned it as sole owner. There was no title search done. There was no documentation. But we're not basing our ownership on that. We can see that it was joint tenants and the legal title went to Stewart. What we're saying is the statute is very clear on adverse possession that we are the owner of the property because we possessed the property for excess of the 20 years. So we're acquiring title not by legal. Are you talking about your plaintiffs or are you talking about your plaintiffs and the mother? Actually, my contention is that John Stewart owned the property after 20 years because he had an ouster of Stewart. So when he died, he already had his 20 years. The court, but if you don't, the ouster standard is higher than the regular. Did you raise this in a pleading as an alternative theory? I did. As opposed to adverse possession? Well, no, it is adverse possession, Your Honor. But adverse possession against a co-tenant requires a higher standard than adverse possession against a non-co-tenant. Well, if he didn't oust her, the defendant, then how could this be anything other than permissive and therefore it was never hostile? If he didn't oust her, no, the permission wasn't coming from John O'Connor. They're arguing that Rachel Stewart gave us permission, and we're saying that never happened. There was never any discussion. The actions of John O'Connor aren't granting permission. It's the actions of Rachel Stewart that they're arguing granted permission. But the facts are that she never had any conversations or communications regarding the property. She never talked to John O'Connor after she left the property, according to her deposition. Never had any communications with Gloria O'Connor or Christine Valenciano. So I don't know how she could have granted permission. Could you clarify to me whether there was an ouster or an abandonment? There's an ouster. And I guess from my mind, I'm calling it abandonment because she left the property never to return. And how did he ouster? He ousted her. In divorce court? No. In a telegram? No. In a Christmas card? No. How? Under the law, the standard for ouster, and I want to read, if I can, this is the standards in Little John v. Barnes. It's United States Supreme Court 138 IL 478. Actually, it has a nice definition of what an ouster is. It says, if I may, Your Honor. It's not in my pleadings. I didn't. It's by Illinois Supreme Court. It says, but even if it should be held that by deed he became a tenant in common with the complainant, we still think the evidence sufficient to justify the decree below on the grounds that his possession at once became so hostile in its character as to amount to a constructive ouster of his co-tenant, and put the statute of limitations in motion against him. It is unreasonable to suppose that during all these years of Soville, Soville was the possessor. May it continue, Your Honor? Possession, Soville's possession, the appellant should have given no attention whatever to his rights in those lands as he now claims existed, knowing that Scoville was exercising acts of absolute ownership, paying taxes, and in every manner treating it as it belonged to him. And they said those acts were those of an ouster of a co-tenant. And that's what happened here. The co-tenant, who would be John O'Connor, in every way treated the property as it was his, with no accounting to Rachel Stewart, with no accounting or reckoning to her. So he possessed the property as his principal residence. And if it was permissive, what difference would it be insofar as what you just described in the case citation and in this situation where she didn't contest and he never, quote-unquote, held the property as if it were his own and antagonistic to her? She would have to be consenting to his use. And that requires an act, letting them. Who has the burden? Is it the possessor who has to do things in such a way, like possibly giving notice that I own this property, you don't have the right to be here, get out of here? Or is it the duty of the other co-tenant to periodically reassert their right to possession? Who has the burden of establishing the hostility? That's a great question. The burden of proving permissive use is on the person claiming they granted permission. The courts say that's their burden. That's a defense. It's not something we have to prove that there wasn't. So the burden is on them. And, in fact, the case is, I think, the Polis case, says that if it's vacant property, the presumption is that it's permissive use. If it's improved property, here it's a single-family residence. The law is very clear that if it is an improved property, the presumption is that it's not permissive use. How does this reconcile with the first-victim case that opposing counsel cited relative to the mother and the daughter? Mother and daughter had an expressed agreement. They specifically, in writing, I don't remember what it was. The court found there was an expressed agreement as to what was going to happen with the property. That expressed agreement was the permission. It was the consent from the title owner to the daughter that you're going to live in this house, I'm going to be the owner. That's an expressed agreement. We have no expressed agreement. All we have is Rachel Stewart left the property in 1968, never returned again, never communicated with anybody regarding the property. That's all in her deposition. Any questions? Yes. So basically your position is that John O'Connor and his first wife were joint tenants. At the expiration of 20 years after their divorce, basically at that point he had, he acquired title based on adverse possession and your theory of ouster. I don't think the divorce has anything to do with it. The date of possession. I'm just taking that date as the day where she left. The day that she left, I believe that 20 years after that date, after he controlled the property, never accounted to her, never, quite frankly, never knew where she was. Your point is that that equates to ouster, and based on that John O'Connor then had full title to that property. That is my position. Without notice to Rachel, without any change in the legal status of the title. Correct. And that therefore Gloria took, as his wife at the time of his death, took the same title that John had acquired based on his 20 years. Can I expand a little on that? In addition to that, and if you find that there wasn't an ouster, okay, and the alternative, Gloria's right, beginning in 1993, she had adverse possession. She continued on controlling the property exclusively until her death 17 years later. Then by descent, Christine Valenciano and by deed, and that's what the case law says, that's how you can transfer your possessory interest to a successor. Without the deed, it would have passed to her anyway. Because she would pass because she'd be the sole heir. So the possessory interest passes to Christine. But the critical link is John's title, if you will, at the end of 20 years of adverse possession based on your theory of ouster. I think there's two independent ways you can find the adverse possession. You can find it in John O'Connor before his death, and you can find it in Gloria O'Connor and Christine Valenciano's possession after his death. So we have 50 years. We need 20. So we have a 20-year term while John O'Connor was alive, and we have a second 20-year period after he died. That's if you could tack the times together. We don't have to tack John and Gloria's together. We do have to tack Christine and Gloria's together. Which you can by law. The law is very clear that you tack on possession as long as it's continuous either by descent or commands. And we have both. We had a deed a month before she died, and she's the sole heir. So she gets to, by law, there's no cases. That is very clear in the law. You get to do that. But do we need her to be, Christine, to be actually using the property? She does. She needs to control the property. You don't have counsels argue that she had to live there. There's no requirement under the adverse possession law that you have to reside there. The property is in Fox Lake. She lives in the neighborhood. She possessed the property. Shortly after her mother's death, she did significant remodeling to the house. The house was in poor shape. She spent, you know, $40,000, $50,000 remodeling the house. Then subsequently the house burned down, and then she rebuilt the house. I don't know how you can say that's not controlling the property. And obviously it shows that she believes she owned the property as well. Any other questions? Thank you, sir. Thank you. Mr. Boyd, you may proceed. I'm going to take great issue with our bond. Our bond, I'm sorry. That's okay. The end looked like a Y. I want to take great issue with one of the points that Mr. Venturi just made at the end of his argument in response to Justice Jorgensen's question. I don't see how John O'Connor could have possibly asserted an adverse possession claim. John and my client were joint tenants, not tenants in common. There is a line of case law dealing with the season and ouster where you can remove a co-tenant, but only when that co-tenant is a tenant in common. They were joint tenants here. There is absolutely no case law in Illinois where one joint tenant can take over a property from another being an adverse possession claim. So I disagree with that statement. The other thing that I'd like to point out is things that didn't happen here that probably would have prevented this case from ever arising in a separate being here. When they got divorced in 1968, the property was left in the joint tenancy. In a lot of divorce cases, it's very common for the parties to figure out what to do with the marital home or any of the real estate that's owned by the couple, and one party beats the property over to the other, or there's something put into the marital settlement agreement that says one spouse is going to refinance the property or we're going to put the house up for sale. What did the marital settlement agreement say? Unfortunately, we don't know here. The case was sold, but there was no paperwork available from it. My client no longer had it. So we don't know, but what we do know is that it was just left in joint tenancy. Wouldn't you only know that based on the title? Correct. You don't know what happened in the divorce. I can't disagree with that, Your Honor. I suppose it's possible it said in there that it was going to go to John, but there's no evidence of that in this record that we can rely on. Well, if it said it, wouldn't it also say that she should quit claiming the property to him? Correct. And if she didn't, then he could have gone back into court to get an order or either force compelling her to sign it or asking the judge to sign it. But the other piece that's really missing here is if John O'Connor truly believed that he didn't want this property to transfer to his ex-wife upon his death, the simple way to dissolve a joint tenancy is to record a quit claim deed. If one joint tenant simply quit claims the property from himself to himself, it severs the joint tenancy and makes it a tenancy in common. That's all he had to do from 1968 up until the time he passed in 1993. He had 25 years to do it. He could have severed that joint tenancy, made it a tenancy in common, and then his family would have had a claim to 50% of this property. That's not what he did. He left it in joint tenancy. It was a matter of public record that it was a joint tenancy. He knew or should have known during his lifetime and for that 25-year period that when he passed away it was going to go to his ex-wife. Can your client or did your client affirmatively remember? Now, we didn't, you know, the marital settlement agreement or the divorce or the judgment said nothing about the house. I believe that was her testimony in the deposition is we didn't discuss it. She can't remember some other things. She remembers that. Well, essentially her testimony was I was so interested in it. She was in an abusive relationship. I was so interested in just getting out of town I didn't care. I just wanted it over with. But beyond that, no, she had no memory or specific recollection of what was supposed to happen with the house. Unless your honors have any further questions, I have nothing else. I think you cited to a case called Hanson. Is that correct? Let me see. Page 10 of my brief. That is a second district case, 1978. When an adverse claimant comes into possession of land thinking that he is not the record title holder, such possession lacks the requisite hostility for an adverse possession claimant, which I think is exactly what happened here. When Gloria O'Connor became the sole possessor of the property in 1993, she had absolutely no way of believing that her husband was a record title holder or that she was a record title holder. So, again, this is not a hostile or adverse claim. It was permissive use, and it remained that way. And it would have ended had my client been informed sooner that her ex-husband had passed away. I asked Mr. Venturi the question relative to whose duty is it to establish the hostility or the lack thereof insofar as is it the husband or the wife who was supposed to make some affirmative, do some affirmative act or make some document or something to establish either an ouster or a permissive situation? Well, I believe the case law is very clear that the plaintiff has a very difficult burden to meet, and they need clear and unequivocal evidence. So I would posit that if they were asserting a hostile claim, that the burden should have been on the plaintiff. Yes, we have raised permissive use as an affirmative defense, but the burden has to be on the hostility. I don't believe the record can show that. Thank you. If we have other cases on the call, we'll take a short recess.